Argued June 30, modified and remanded October 19, 1921.

## LONG ET AL. *v.* TITTLE ET AL.

(201 Pac. 217.)

**Waters and Watercourses—Evidence Sustained Finding That Lost Contract Reserved Right to Overflow Land Conveyed.**

1. In a suit to restrain interference with the right to overflow lands to obtain a sufficient height of water in a mill-dam, and for reformation of deeds to such lands, evidence *held* to sustain a finding that the contract under which the deeds were made, and which could not be found, reserved the right to the use of the mill-pond and to overflow the land conveyed.

From Tillamook; GEORGE R. BAGLEY, Judge.

Department 1.

This is a suit brought by Catherine A. Long and A. G. Beals against Lee J. Tittle and his wife Jessie Tittle, A. M. Hare and John Simmons for the purpose of restraining the defendants from interfering with an alleged right to overflow a sawmill pond and for the further purpose of reforming two certain deeds. One of the plaintiffs, while operating a sawmill, caused the waters in the mill-pond to overflow upon land owned by one of the defendants. Simmons tore out a portion of the dam which held the water in the pond

and caused the overflow. The plaintiffs claimed, but the defendants denied, that the owner of the mill is, by force of a certain written contract executed on January 25, 1917 by Catherine A. Long and Lee J. Tittle, entitled to overflow land to which Tittle holds the legal title and in which Simmons has an interest. The dispute over the asserted right of overflow brought about this suit in which the plaintiffs on the one side are seeking: (1) To enjoin the defendants from interfering with the plaintiffs in the exercise of the alleged right to overflow; and (2) to reform two deeds; and the defendants on the other side are praying for equitable relief. A trial resulted in a decree for the plaintiffs. The defendants appealed.

The plaintiff Beals purchased the sawmill from Catherine A. Long and now owns it. Lee J. Tittle has the legal title to the land which has been overflowed; John Simmons verbally agreed to purchase this land from Tittle, and Simmons has resided upon and made improvements on the premises; and at the time of the trial Hare held a mortgage on the overflowed land.       REVERSED AND REMANDED.

For appellants there was a brief and oral arguments by *Mr. Webster Holmes* and *Mr. T. H. Goyne.*

For respondents there was a brief over the names of *Messrs. Johnson & Handley, Mr. H. T. Botts* and *Mr. George P. Winslow,* with oral arguments by *Mr. Botts* and *Mr. Winslow.*

HARRIS, J.—The facts presented by this suit are somewhat complicated. There are two tracts of land which must be kept in mind; one is the NW. ¼ of section 31 in a certain township in Tillamook County;

and the other is the SW. ¼ of the same section. For
convenience the line which marks the south boundary
of the NW. ¼ and the north boundary of the SW. ¼
will be designated the division line. The sawmill
stands on the SW. ¼. Tittle holds the legal title
to the NW. ¼ and Simmons resides upon it under a
verbal agreement to purchase. The improvements
made by Simmons are valued at about $800. The
sawmill is located about 350 feet south of the division
line. On the north side of the mill and next to it is
an artificial pond which was constructed by excavating
and diking. According to one witness "the main
pond is in a pretty near rectangular or circular
shape." Measured from the west to the east side
the "main pond" is about 300 feet wide. A creek
running through the NW. ¼ supplies water for the
pond. The creek enters the NW. ¼ and runs in a
southerly direction towards the mill. When the saw-
mill was erected this creek ran in a southerly direc-
tion until it reached a point somewhere between 150
and 600 feet north of the division line and at that
point the creek turned towards the east. The water
was carried to the mill-pond by constructing a dam at
the point where the creek turned towards the east
and by digging a ditch from that point to the mill-
pond. It is appropriate here to say that some of the
witnesses differed widely in their estimates of dis-
tances; and, too, some of the witnesses used the words
"here" and "there" when pointing to a rough
sketch used at the trial,—words which fail to inform a
reader of the paper record. However, it is not neces-
sary to attempt to reconcile these differences for the
reason that a statement of the approximate distances
will suffice. The creek as it now runs, is only about
4 feet in width until it reaches a point about 300 feet

north of the division line and at this point the creek
widens to about 8 or 10 feet and continues to widen
until it reaches a width of about 25 or 30 feet which
width is maintained until the "main pond" is reached.
This widened portion is referred to as the "channel."
The situation, then, is such that the water runs
through the creek, passes through the "channel" and
finally empties into the "main pond," or that part of
the pond which one of the witnesses described as
being "in a pretty near rectangular or circular
shape." The whole of the "main pond" is on the
SW. ¼. The mouth of the "channel" is about 35
feet south of the division line; so that, with the ex-
ception of about 35 feet of its length, the "channel"
is within the NW. ¼. A dike or embankment and
"dams" are maintained along the east side of the
"channel" and creek for a considerable distance
north of the division line. This embankment and
these dams vary in height. One witness stated that
"for about one hundred and fifty feet beyond the
division line" the top of the dike was three feet
"above the level of the surrounding soil." Parallel
with the "channel" and creek and on the west are
some hills. It is difficult to learn from the record
even the approximate distance between the foot of
these hills and the creek and "channel," but we infer
that it is about 200 feet. We also infer from the
record that the dike or embankment and dams on the
east side of the creek and "channel" are raised
higher than the west side of the creek and "channel";
and that therefore when the water is permitted to
reach a certain height in the pond it begins to back
up and as the surface of the water rises in the pond
the water continues to back up in the "channel" and
creek until it pours over the west side of the "chan-

nel" and creek and spreads out towards the hills and overflows the land between the foot of the hills and the "channel" and creek.

The sawmill was built in 1900, and at the same time the mill-pond was constructed, the ditch was dug, the dam was put in, and the water of the creek was diverted to the mill-pond. The mill was operated by different persons until 1909 when Frank Long acquired it. On June 6, 1914, the defendant Lee J. Tittle purchased a half interest in the sawmill, and Long and Tittle operated the mill as partners until Long's death. On January 16, 1917, Long died; and on January 25th following, Tittle and Catherine A. Long, the widow of Frank Long deceased, entered into a written contract. It is not entirely clear whether the contract was executed in uniplicate or in duplicate. If there was only one writing, it was lost; and if there were two writings both were lost. The plaintiffs have at all times contended that the written contract contained a provision giving to Mrs. Long and her assigns the right to overflow the NW. ¼ when operating the sawmill; the defendants have at all times insisted that, although the contract permitted the owner of the sawmill to back up the water in the channel and creek, the contract did not permit the owner of the mill to back up the water until it overflowed the NW. ¼; and hence the efforts of the litigants were in a large measure devoted to an attempt to establish the contents of the lost written contract.

In order to understand the reasons inducing the execution of the contract and the circumstances attending the negotiations preceding the contract, it is necessary to narrate some additional facts. The sawmill and "main pond" are upon leased ground.

The SW.¼ has not been owned by the owners of the sawmill. Tittle contracted to pay Long $6,000 for a one-half interest in the mill, but at the time of entering into the partnership he paid only $750. Although Tittle may have been entitled to some credits, it is conceded that on January 25, 1917, he had not yet paid the balance of the purchase price.

O. E. Dennis owned the NW. ¼ in 1900 when the sawmill was erected. On November 3, 1900, Dennis leased the NW. ¼ to the owners of the mill for a period of ten years for a stipulated annual rental, which for each of the last six years of that period was fixed at $100. Upon the expiration of the ten-year period the owner or owners of the mill rented from year to year and paid $100 to Dennis each year. Tittle knew in 1914 when he purchased an interest in the mill that Long had been paying rent to Dennis. In 1915 Long and Tittle purchased the NW. ¼ from Dennis and encumbered the land with a purchase money mortgage for $2,250. No payments were made on this mortgage prior to Long's death. At some time during the existence of the partnership, the sawmill was destroyed by fire with no insurance. The mill, however, had been partially reconstructed before January 25, 1917. The books of the partnership were in confusion and difficult to understand. The partnership owed many creditors. The debits exceeded the credits. There was no cash on hand. Apparently there were no "live" assets at all except the sawmill. In this situation Beals and Connie Dye entered into negotiations for a lease upon the sawmill.

Mrs. Long, Beals, Dye, Tittle and Frank Long, Jr., met on January 25, 1917, at the office of S. S. Johnson, who was acting as Mrs. Long's attorney, and

then and there Mrs. Long and Tittle entered into a written contract.

It is conceded that Tittle agreed to transfer to Mrs. Long all his interest in all the partnership property except the NW. 1/4, and that Mrs. Long obligated herself to cause to be conveyed to Tittle, subject to the Dennis mortgage, all the interest which her husband had in the NW. 1/4 at the time of his death, except certain rights reserved to her in the written contract. Tittle assigned the partnership accounts to Mrs. Long, but she agreed to pay the partnership debts. We also understand that Tittle was relieved from any obligation to pay the balance due on his contract made with Long, the deceased, on June 6, 1914. The parties do not agree upon the extent of the reservation expressed in the contract, and this disagreement is the cause of this lawsuit. It is admitted by all parties that the contract reserved the right to construct a logging road over the NW. 1/4 although the parties disagree as to the place where the road was to be located. Tittle says that the logging road was to be built on the side of the creek and as near as possible to it. Mrs. Long says that it was to be located as near the foot of the hill as practicable. In this particular the trial court found in favor of the contention of Mrs. Long and decreed that the right of way for logging purposes be confined to a location on the west side of the creek "following the foot of the hill thereon." We approve this finding of the trial court.

Tittle claims that the contract did not reserve to Mrs. Long the right to overflow any land in the NW. 1/4 west of the creek. He testified that the question of overflow was discussed at length; that it was not necessary to overflow any of the NW. 1/4; that he finally convinced Mrs. Long and Beals that it was

not necessary to overflow the NW. ¼; and that, employing Tittle's language "if I remember it" the contract contained an express provision "that they should not overflow the land."

The plaintiffs allege that the contract provided that—

"there should be reserved in the conveyance of said property to said Tittle, as appurtenant to said mill, all of the rights of way for logging and mill purposes then existing over and upon said land for the purpose of operating said mill, and including the right to extend said pond over and upon said land, and to use said pond and to overflow said land from said pond in such use thereof as the owner of said mill might find convenient in the operation thereof."

The court found from the evidence that the contract reserved to Mrs. Long the right—

"for herself individually, and for the estate of her deceased husband, to make use of said northwest quarter so far as should be found necessary or convenient in the ordinary operation of said sawmill, and that there should be reserved in the conveyance of said property to said Tittle, as appurtenant to said mill, all of the rights of way for logging and mill purposes then existing over and upon said land for the purpose of operating said mill, including the right to extend said pond over and upon said land, and to use said pond and to overflow said land from said pond in such use thereof as the owner of said mill might find convenient in the ordinary operation thereof."

Pursuant to the contract Tittle executed and delivered a conveyance to Mrs. Long on January 25, 1917. There were two minor grandchildren and there were also some adult heirs. The contract contemplated that Mrs. Long would acquire the interests of the adult heirs and then convey to Tittle all her in-

terest, and appropriate steps would be taken to bring about a guardian's sale of the interests of the two minors. Time was required for obtaining the interests of the adult heirs and for bringing about a sale of the interests of the minor heirs. Apparently the parties did not think it would be necessary to cause a sale to be made by the legal representative of the estate of the deceased, but it subsequently appeared to be necessary; and, accordingly, Mrs. Long, who had been appointed administratrix of the estate of her deceased husband, petitioned for an order to sell the estate's interest in the NW. ¼; and afterwards it was sold by the administratrix to Tittle.

On December 10, 1917, Mrs. Long as guardian of the minors executed a deed conveying to John Simmons the interest of the two minors. On December 17, 1917, Mrs. Long quitclaimed to Tittle. On March 30, 1918, Mrs. Long as administratrix conveyed to Tittle.

It will be observed that the guardian conveyed to the defendant John Simmons. It is conceded that the guardian in truth sold to Tittle and so reported to the County Court. The execution of this deed to Simmons instead of to Tittle was probably due to the fact that soon after January 25, 1917, Simmons verbally agreed to purchase the NW. ¼ from Tittle, and in April, 1917, Simmons took possession and thereafter remained in possession continuously.

We may now proceed to eliminate the defendants Simmons and Hare as litigants. At some time prior to October 21, 1918, Simmons quitclaimed to Tittle. Tittle had reduced the Dennis mortgage to $1,500; and on October 21, 1918, Tittle paid the Dennis mortgage by borrowing $1,500 from the First National Bank of Tillamook, and he then gave a mortgage on the NW.¼ to secure the bank. Subsequently the bank

sold and assigned the mortgage to Hare. When Simmons took possession of the NW. ¼ the legal title was held by Tittle and the heirs of Frank Long, deceased, subject, of course, to the right of creditors of the partnership. Simmons made a verbal contract with Tittle and at that time the latter owned an undivided half interest in the land. It must be remembered that deeds were not delivered to Tittle until the following December, or several months after Simmons took possession under his verbal agreement. Simmons knew that the partnership owned the mill and the NW. ¼. When Mrs. Long executed her deed in December, 1917, it contained language which notified all persons of a reservation; and so did the deed given by her as administratrix on March 30, 1918. Simmons has not even yet paid a dollar on the purchase price, although he has made improvements worth about $800. While there is no evidence that Simmons saw or read the written contract, it is fair to suppose that his son-in-law Tittle told him that a contract had been made with Mrs. Long for the purchase of the premises. In the circumstances disclosed by the record, if a right to overflow can be asserted as against Tittle, the same right can be asserted as against Simmons, for the right of the latter is no greater than that of the former.

The record shows that on March 27, 1920, after the trial in the Circuit Court, Hare satisfied the mortgage given by Tittle, and hence Hare is no longer interested in the controversy. Having determined that Simmons does not possess any rights in excess of those acquired by Tittle, and that Hare no longer has any interest in the NW. ¼, we may again turn our attention to the inquiry: What did the contract between Tittle and Mrs. Long reserve to the latter?

It is conceded that the contract contained some reservation. The contract, the papers filed in the probate court in connection with the sale by the administratrix and the orders made by that court, the deed given by the administratrix and the deed made by Mrs. Long in her individual capacity were all prepared by the same attorney. So far as the reservation is concerned the language in the administratrix's deed is different from that in the individual quitclaim deed made by Mrs. Long; the language of the reservation in the administratrix's deed is not as broad as found in the papers filed in the probate court, nor is it as broad as the language of the orders made by that court; and, yet, it is admitted that the proceedings in the probate court were had and the two deeds were executed in an attempt to carry out the provisions of the contract. The explanation of the differences to which attention has been directed is found in the fact that the written contract was not available, and it became necessary to depend upon memory alone in the preparation of the deeds, the papers filed in and the orders made by the probate court.

The language of the reservation in the quitclaim deed made by Mrs. Long is: "Reserving the rights of way for logging and mill purposes now existing over and upon said land for the purpose of operating" the mill. It is here important to note that on January 25, 1917, when the contract was executed, the right of way for a logging road, although admittedly reserved in the contract, had not yet been established or located upon the ground; and so far as is disclosed by the record there was no right of way in use "for logging and mill purposes," except the creek and "channel."

101 Or.—41

In the administratrix's deed the language of the reservation is as follows: "Except the right of way for logging and timber purposes, being in connection and appertaining to" the mill. The reservation, it will be noted, speaks of " *the*" right of way. Upon turning to the petition of the administratrix for an order to sell the NW. ¼, we observe that it speaks of "the right of way for logging and timber purposes" and "the right to use the pond thereon for mill purposes." The order for the issuance of a citation to the heirs speaks of the right of way and pond in the same language as does the petition for the order of sale. The citation to the heirs gives notice that a petition has been filed for authority to sell the NW. ¼ "except the right of way for logging and timber purposes" and "the right to use the pond thereon for mill purposes." The same language is found in an order appointing a guardian *ad litem* for the minor grandchildren, the order authorizing the sale of the real property, the notice of sale as published in a newspaper, and the report of the administratrix showing the sale to Tittle. The language which refers to the pond is significant. It is not to be supposed that the word pond would have been used unless Mrs. Long had reserved some right in the pond when she made the contract with Tittle. Although the trial did not occur until October, 1919, the probate proceedings for the sale of the property were begun in December, 1917, or only about eleven months after the execution of the contract. No dispute about the language of the contract arose until about June, 1918, when Simmons tore out a dam which Beals had recently built; and, consequently, the papers filed in the probate court were all filed before any controversy arose.

When Tittle and Mrs. Long made their contract they were contracting with reference to a sawmill which had been in operation for nearly two decades and had been operated under practically the same conditions during that entire period. The mill cannot be operated successfully without a mill-pond. The defendants say that the "channel" is "no part of the pond." Our conclusion is that the evidence shows that logs have been stored in the "channel"; that the "channel" has been used as a part of the pond; and that it is to be deemed a part of the pond.

Beals and Dye were interested in knowing whether, if they leased the mill, they would secure the pond rights; because they knew that the mill could not be operated without the pond, and they also knew that the pond could not be used unless the water could be backed up so as to obtain a sufficient depth to float logs. Mrs. Long was to receive the partnership assets, but she was to take care of the partnership debts. Mrs. Long knew that Beals and Dye would not lease the mill unless they could also have the pond rights. Beals expressly stated when in Johnson's office that he would not consider a lease unless he could get the pond rights. When we view the positions occupied by the contracting parties in connection with the admitted provision of the contract, it becomes manifest that there were strong inducements for both Tittle and Mrs. Long to make a contract which would meet with the approval of Beals and Dye; and it is likewise manifest that it is not at all likely that Beals and Dye would have been satisfied with a contract which did not reserve to Mrs. Long all necessary pond rights. It is a significant fact that the evidence shows that the contract

when signed was satisfactory to Beals, who it appears conducted the negotiations for himself and Dye.

The evidence shows conclusively that Long and his predecessors had so used the pond as to overflow the NW. ¼. Mrs. Long testified that her husband and Tittle bought the NW. ¼ for the purpose of avoiding payment of rent for the right of overflow. Although contradicted by some of the witnesses for the defendants, witnesses for the plaintiffs testified that Long and Tittle continued to overflow the NW. ¼ after the formation of the partnership and during its existence; and we think that the clear weight of the evidence is that the partnership continued to overflow the NW. ¼ just as Long and his predecessors had overflowed it, although the extent of the overflow may have been at times less than before, due to the fact that the pond was "dug out" twice. The trial court viewed the premises and, we infer, concluded from the evidence that the overflowing did not cease with the formation of the partnership.

The interested parties were dealing with a mill which had been operated for seventeen years; they knew there was a creek and a pond; they knew whether the pond had overflowed, and if so, how much; and although the written contract, if discovered and produced might actually show on the one hand an express provision prohibiting all overflow or on the other hand an express provision permitting overflow without limit, we must necessarily base our conclusions upon the testimony of witnesses who have undertaken to tell of the contents of the writing; and after giving to the evidence our most careful consideration we find ourselves unable to reach any other conclusion than that it was agreed that Mrs. Long should be entitled so to use the pond, if necessary,

as to overflow the land west of the creek and "channel." The written contract may have used the word "overflow"; or it may have employed the words "pond rights with the right of overflow"; or it may have used merely the words "pond rights," meaning by these words the right to back up the water and to overflow in order to secure enough water to float logs in the pond. Beals testified: "Mrs. Long was to have the pond rights and the overflow rights"; "the pond with the privilege of overflowing"; "I think it said the pond rights with the privilege of overflowing"; "that is my recollection" that something was said about "pond rights with overflowing." Mrs. Long testified that Tittle was to "give me the right for a logging road and the right to overflow the pond on that property"; "the sense of it was that he was to give me the right of that overflowing"; "I was to have the right to overflow; that pond overflow." Harry Long read the contract and he stated that "it was for the pond right; it gave her the pond right"; "the overflow; the right to back the water up with this dam, for the pond." Connie Dye testified thus: "I know that Tittle agreed there in the office that he would give Mrs. Long all rights and title to the pond." S. S. Johnson the attorney who prepared the contract testified that according to his recollection the right to overflow was discussed and agreed upon, and that the written contract reserved to Mrs. Long the right to overflow. Tittle stated that as he recollected the contract it contained an express provision prohibiting the overflow of the land.

No witness corroborated Tittle unless it can be said that he was corroborated by Frank Long, Jr. who is a son-in-law of John Simmons and a son of Mrs. Long. This witness stated that "the water was not

to be raised in the pond any higher than my father and Mr. Tittle had raised it when they were logging there," and that at that time "it was not overflowing the property." Frank Long, Jr., also testified that "there was a reservation kept for the pond right."

1. The overwhelming preponderance of the evidence is that the pond right was reserved by Mrs. Long. Pond right meant the right to use the pond and the right to back the water up sufficiently to float logs in the pond. The evidence shows that the interested parties understood such to be the meaning of the words "pond right." When the parties talked about the pond right and contracted with reference to the pond right they must be deemed to have had in mind the pond right as it had been exercised in the past: 18 C. J. 280. There is no evidence warranting any other conclusion. As previously stated it is our conclusion from the evidence that the partnership overflowed the NW. ¼. When therefore the parties agreed that Mrs. Long should have the pond right, and they failed to specify the extent of the right to overflow, they must be deemed to have agreed that Mrs. Long should have the right to overflow to the extent that such right had been previously exercised.

Beals and Dye leased the mill from Mrs. Long soon after the contract of January 25, 1917, and they operated the mill under the lease until February 9, 1918, when Beals purchased the mill from Mrs. Long. The evidence indicates that in 1918, Beals raised the dams and embankment higher than they had been before, and that the overflow was therefore greater than before. The evidence also indicates that the process of bringing logs into the pond also brings debris which, as it accumulates, raises the bed of the pond

and, unless removed, necessarily raises the surface of the water higher, with the result that the overflow correspondingly increases. The evidence indicates that since February, 1918, debris has accumulated in the pond and that on that account it became necessary to back the water up higher than it had been before. The parties must be deemed to have agreed that the pond should be maintained in the future as it had been maintained in the past. It appears from the evidence that the pond was ''dug out'' twice during the existence of the partnership. In a word, by reserving the pond right including the right of overflow Mrs. Long reserved the privilege of exercising the same rights that had been previously exercised and the privilege of exercising those rights to the same extent as before, but no more than before.

The parties may wish to have the trial court determine the exact extent of the right of overflow so that it may be marked upon the ground and thus avoid future confusion and controversy; and in order that they may do so the cause will be remanded with directions to the trial court upon application of any interested party to hear evidence and determine the extent of the pond rights, measuring those rights by the extent to which they have been previously used. As already explained the pond was dug out twice during the existence of the partnership. Manifestly it would not be fair to use as a measure the extent of the overflow as it was immediately after the ditch was dug out. Long operated the mill alone from 1909 until 1914 when Tittle became a partner. When Tittle purchased he knew the extent to which Long had overflowed the land, and so, too, did Mrs. Long know the extent of such overflow. Whatever under ordinary working conditions was the maximum of

the overflow between 1909 and January 25, 1917, ought to be taken as the limit beyond which Beals cannot go.

If the administration of the estate of Frank Long has been closed, then there is no legal representative who can make a corrected deed; and in that event it will be appropriate for the trial court to reform the administratrix's deed so as to make the reservation in the deed correspond with the papers filed and orders made in the probate court. If the estate has not been closed application can be made to the probate court for an order authorizing the administratrix to execute a corrected deed. The language of the decree of the trial court is possibly too broad in that it fails to measure the right of overflow as herein indicated. With the slight modifications indicated in this opinion the decree of the trial court is affirmed; but the cause is remanded to the court below for the purpose of enabling the trial court, upon proper application, definitely to fix the limit of the right of overflow, and also in order that the trial court may decree a reformation of the administratrix's deed in the event it is made to appear that the estate has been closed: See *Smith* v. *Butler,* 11 Or. 46 (4 Pac. 517); note in 11 Ann. Cas. 85. Neither party shall have costs in this court. REVERSED AND REMANDED.

BURNETT, C. J., and McBRIDE and BEAN, JJ., concur.